May it please the Court, Sven Brent Erickson for the Appellants, Wild Fish Conservancy and other conservation groups. The central issue in this appeal is the decision by the National Marine Fisheries Service to change the concept of viable population away from its intended purpose as an indicator of a population that is healthy enough to sustain itself indefinitely into a tool that This is contrary to the Requirements of the Endangered Species Act and of the agency's own regulations. Counsel, what is our standard of review in this petition for review? Arbitrary and capricious are contrary to law. And we maintain that the action that the agency has taken is contrary to law, contrary to both the Requirements of the Endangered Species Act and of their own regulations. It seems to me that what's happening here is almost a verbal or definitional problem. They're using the same word viable, but they're using it to mean something else. And the question isn't whether they can change the meaning of the word viable. It's whether the concept that they are using meets the statutory standard. And offhand, with one exception, one area, I'm not sure why it doesn't. The situation here, because you have a listed subpart of the salmon species, that's made up of numerous populations, the agency had to develop some criteria to evaluate the condition of the individual populations within the ESU. And that's reflected in the BSP paper and in the work done by the TRT. And the concept of viability is articulated in those documents as a measure of extinction risk. Viability means the population is viable when it is a negligible risk of extinction. What I understand them to be saying right now in this, as to this particular problem, is the real, the main issue as to long-term viability is the environmental circumstances. And as to the fisheries, they're not going to change that. So with regard to the fisheries and the standard being to not substantially adversely affect viability, the only question is, is more fishing going, you're not going to have more fish than the environment can support no matter what. And therefore, the relevant question is, are you going to fish down below what the environment can now support? And that's the relevant consideration in terms of, for fishing with regard to affecting viability. Is that not what they're saying? That is their position. In Raymond's maybe naive language. Yes. And what's wrong with that? The problem with that position is it essentially assumes that, one, that they know how many fish the environment can support, and two, that managing to or trying to spot some sweet spot for these populations that they admit are well below where they need to be to be recovered, that that is sufficient, and that if, in fact, that there is no need to push additional spawners into this habitat to improve and actually maintain their prospects of recovery. In essence, the idea here is that if you were to sustain the level of harvest that they have proposed indefinitely, that these fish not only would not go extinct, but there would not be any risk to their prospects of recovery. Now, if you can sustain a harvest at these rates indefinitely without risk of extinction and without risk to their prospects for recovery, why are they listed at all? If they can sustain a harvest indefinitely... Well, because there's no risk to their prospects for recovery, but that isn't recovery. That's why the standard is not recovery. It's no risk to the prospects of recovery. But the problem with the approach the agency took is that they told themselves at the outset harvest is not going to have an effect on recovery, and then they retooled their analysis to assume basically, well, if we think we can identify a sweet spot for the population based on current conditions that maximizes productivity, we can soak up all the excess productivity and give it to the fishermen without any risk to their prospects. It seems to me your strongest argument is they could be wrong. I mean, their numbers could be wrong, and they could be predicting nature wrong. But they have some built-in checks on that, too, don't they? Well, in fact, they don't have a detailed record on the idea of whether or not they're right or wrong, on the idea of whether or not the populations, the habitat can support more fish. Counsel, the reason I asked you the standard review is that we are dealing with a lot of science here, and more particularly biology. I am not a biologist. I can't speak for my colleagues. But don't we have a very deferential approach here? To what extent do we have to get into the science to pursue the argument that you're making? It's difficult. Well, in fact, what we've tried to explain is that the issue, actually the issue that I've been discussing with Judge Bergeson, is really not well-framed in the existing record. And the reason it's not well-framed is because they applied the wrong legal test in their analysis. And in essence, if you look at the approach... Let's focus on that. I think we can deal with legal tests. And that's our intent, is to present this as a legal question, is whether or not it is appropriate for the agency to use as its guide for harvest management a standard which does not have a connection to the risk of extinction. Viability, as they have defined it for harvest purposes, is not a measure of extinction risk. It is a measure of the capacity of the habitat. That's a scientific determination. And, in fact, in a number of places, they make the point that the viable threshold that they are using is a response to the spawner-recruit relationship for a given population, and that that may change as the data changes. Now, the data is usually five or more years behind. But, in essence, they're using a measure which is a biological measure and saying this is a viable population based on some biological evaluation, not based on whether or not that population is actually put at risk of extinction by being maintained at this level. But isn't that what the analysis was trying to accomplish? If a given population in this region is left at its current level for 25 years, which is basically the test they applied, what they said is what's the highest harvest rate we can sustain that's going to keep these populations at the level they're at, in essence, for the next 25 years, assuming nothing happens to habitat and otherwise? Well, I don't understand it to be at the level they're at. It's at the level the environment could sustain, which could be higher. And if you look at the data that's in the reports, it's actually other than a handful of rivers, it's levels that are pretty much where they are right now. Well, the only thing is, when is this plan running out? It's a five-year plan. And it's almost over. That's true. But the policy behind it will be perpetuated indefinitely unless they're told that they're wrong. It's just like the situation in Columbia. The numbers will be redone, right, or I hope. And so if, in fact, it turns out that the numbers were wrong and the actual ability to sustain was higher, then the numbers will go up. Yeah, the numbers will change. The same approach was, same argument was advanced on the Columbia 10 years ago and rejected in relation to the hydro system, where biological opinions would cover two or three or four years of operation in the hydro system, and the court said, No, you have to look at what are the long-term effects of maintaining your operations as you're proposing. See if you can. I mean, to disabuse me of the notion that this is sort of based on the realities of nature, tell me what your scheme would look like. And I really would like help. How would you take into account in a useful way the more long-term numbers that depend on fixing the, as I understand it, the dams and the pollution and the population and all the other things that are getting in the way of the viability of the fish? So how would you take that number into account in determining harvest? Instead of the current approach, which is to say what's the current estimate of spawner abundance versus our estimate of maximum sustained yield, you'd look at the gap between current abundance and a recovered level. Right, but what would you do with that number? You would manage the fishery to put additional spawners onto the spawning grounds to push the habitat to basically try to increase productivity. But their position is, and now we come back to Judge O'Scanlon's question, is no point because they're all going to die because the environment's not going to sustain them. So the question is, what do we do to go behind that as judges? They're not all going to die. What they said they're trying to do is manage the maximum productivity. If you try this out on another- I'm sorry, I don't understand that. You're saying that they're aiming at maximum productivity instead of maximum survival? That's right. And why do you say that? Well, if you look in the government's brief, there's a curve presented that shows how maximum sustained yield actually works as a concept. There's a curve of productivity, and what they're trying to do is find the sweet spot on the curve. The idea is that in fisheries, as more spawners are put into a river, their productivity increases to a certain point and then decreases after that. And then at a point of equilibrium, you have one new recruit in the next generation for each spawner that has gone into the river. Basically, what they've done is say, we can shoot for the point of maximum productivity and then absorb that excess productivity and give it to the fishermen because if they went into the rivers, we think that there wouldn't be any additional spawners produced in the next generation, so we might as well harvest them. Now, if you were to apply that to another species like spotted owls and say, well, spotted owl habitat has been degraded, and so it's okay if some spotted owls are killed because there are more being produced in the current generation than can actually find nesting habitat in the next generation, and so there's excess productivity in the nests, so it's all right if some are killed. We would in fact say, no, we need to look at what the effect is. What would happen if they used a lower quality habitat? They might be a little bit less productive, but it might actually help the species going forward, and it might be important to the recovery of the species. Can I just change the subject a little bit? The two pieces that I did find troublesome, that I find particularly troublesome, insofar as I understand any of this, of the plan, are the Georgia Strait and Hood Canal determinations because they didn't follow their own numbers. So do you want to talk about that at all? Yes, briefly. The point that our concern there was that an analysis was done, and if you accept the premise of their analysis and say we're wrong on the rest of our argument, you still have an analysis they've done of some of the regions, which they've identified as central and key to the recovery of the species, and found that the harvest rates would be too high. They then offered basically normative reasons why they shouldn't be worried about it, none of which suggest that the harvest will actually be lower on those populations, and while we understand the normative and policy reasons why they think that those harvests should be allowed, they don't suggest that biologically, based on their own analysis, that the species will be okay. I'd like to reserve the balance of my time. You may do so, counsel. We'll hear from the appellees. I'm not sure which sequence we're going to hear from them. Good morning. My name is Ellen Durkee. I'm with the U.S. Department of Justice, and I represent NOAA, and I am sharing my time with Mr. Slonim, who represents the Amici Treaty Tribes in the state of Washington. How have you allocated your time? I'm going to endeavor to spend only ten minutes, and he'll have the remaining five minutes. You have a total of 15, so whatever way you allocate is fine. Right. I know that Mr. Slonim is trusting me to not eat up his time. Very well. This court should affirm the district court's judgment upholding NOAA's determination that the joint tribal and state fishery management plan will not jeopardize the continued existence of Puget Sound Chinook. There are a number of sort of big picture items that I wanted to highlight before I go into some of the weeds of this, but I can tell from your questions that I think you do understand very well the issues, and so I'm just going to mention one, and that is the standard for jeopardy here. There are two processes under the act. There's a recovery planning process, which is a joint federal, state, local, tribal effort, and then there's the jeopardy standard, and we're dealing with the jeopardy standard here, and no one is questioning that the regulation that defines jeopardize the continued existence of is in any way defective, and that defines jeopardize the continued existence of as not appreciably reducing the likelihood of survival and recovery. They do not question that this plan meets the survival aspect of that, so they only question NOAA's conclusion that it does not appreciably reduce the likelihood of recovery. This, by the way, is a very difficult standard for them to attack it on because as this court recognized in National Wildlife Federation, it would be a very rare case where you have a species that's within the range of being able to survive, but yet somehow the recovery part of this definition would make it so that there's jeopardy. Now, clearly in this case... in the plan that it's completely misleading because it isn't the viability standard that you've adopted elsewhere. It's a different standard and not meant to do the same thing. Am I right about that? Yes. I was so happy to hear your question because at the end of the day, after I had struggled through that, that is... I realize it's the nomenclature that becomes misleading, but NOAA has been very clear in using the risk assessment procedure what they meant by viable threshold there, which is they've said from the very beginning of developing that procedure, which was done at the same time as they did the VSP paper, that when they put... when they're doing the input for this methodology, that they don't mean recovery levels. So it is unfortunate they use the same terminology for two questions, but I think it's clear what they were doing. So the overall scheme leads to two questions for me. One, what if you're... what in the plan is built in to account for the possibility, which is a real one given all the vagaries of any kind of scientific analysis, that your assumptions about the, I guess you call it the carrying level, whatever, of each environment are right? I mean, what happens if in fact it turns out that one year there are many, many more salmon than you thought could be there and they seem to be perfectly happy, are you still going to allow the same harvest to continue? What cycle is there to correct for mistakes? Okay. I think there's three responses to that. You're also correct that the important part of this methodology is that NOAA be as accurate as possible in the data that they're using. First of all, I'd point out that they only use this RAP procedure for nine of the 22 populations here because they have the data for those. Where they don't feel like they have sufficient data, they didn't use it. Secondly, this whole management plan has built in to it constant monitoring and adaptive management. What did they use when they didn't have the numbers? When they didn't have the numbers, how can they do it at all? Well, as I think the RAP, what they do is they went back to the generic numbers that had been identified in the VSP papers as being at viability. So for, you know, except for those nine, what they did in order to analyze this plan was to look at those and they found that those were, you know, within the exploitation rate would make that achievable. Now, I guess I'm getting off and I do want to come back and answer your question, how do we know the numbers are right? But I think this is a point where I can emphasize the RAP procedure is only one of many tools that they used to analyze this plan. They were not coming to the conclusions they did solely on that basis. It happens to be the one aspect that the plans want to attack, but there is a great deal of information that supports the agency's decision outside of the RAP. There are many tools they use. But going back to how do we know the numbers are right? Well, there's constant monitoring. On an annual basis they decide what the fishing regime is going to be, how to achieve some of these numbers, and then it's a five-year plan precisely because at the end of five years they want to go back and reanalyze with new numbers and with the new data where we are. The whole idea of rebuilding to recovery here is to, it's got to be an incremental process. You cannot simply transition to where the species are now and next year be in a recovery mode. So it's like running a marathon. If you're an unfit person like I am, I could not go out and run a marathon tomorrow. If I were ever to do that, I would have to go out and train and build up to that place. So what the goal in recovery vis-a-vis the harvest is to take those curves and to move them up the X and Y axis to get to that point of recovery. And so that is, you know, periodically these will change. These numbers will change. The exploitation rates may change dependent on the information that's coming in from this constant monitoring. The other piece that I do want to make sure the court understands is this position of the plants that all that this does is maintain the current population level. That is simply not the case. They are not managing to attain the maximum sustainable yield point. They are managing to exceed that. And to begin with, if you were at maximum sustainable yield, you would be above replacement. So you're already growing the population. Maximum sustainable yield is as far from replacement and productivity on that curve as you can get. So you are going to get greater numbers. I thought it was one to one, so why isn't that just replacement? No, maximum sustainable yield is not one to one. That is the replacement line. But as you'll see on the curves, the MSY, these lines come up. It is the farthest point from replacement line on that curve. But you're allowing the harvest up to the replacement line, as I understood the chart, no? No, no, you are allowing harvest. You're selecting. If you were managing for MSY, you would say, okay, once we meet the maximum sustainable yield, we'll just harvest everything. That's not what they're doing. They set exploitation rates, a percentage of all the adults that could come back and spawn. So they're not managing to get that. So it means that even if you are in excess of the maximum sustainable yield in terms of abundance, 80% of them will still be passed on to the spawning grounds. And that's why it's designed to bring in natural rebuilding. It does pass on. First of all, it's at a level that's higher than replacement, and it's even higher than maximum sustainable yield, way over to the right of that curve, in order that if there is more habitat that comes in in terms of quality or quantity, that there will be extra fish passed on that can capitalize that and move into these areas, which is exactly what I understand plaintiffs do desire. What I'm saying is that the model is designed to do that. So where is the confrontation here? It seems to me you're telling us that both of you have the same objective, but I gather they don't have the same confidence that you do. Well, you know, I'm not exactly sure what plaintiffs think should happen here. I don't know whether they're advocating having no fishing whatsoever in the tribe and states or whether they simply want a lower level of fishing. But I think that their attack on the assessment here fundamentally is based on a misunderstanding of the methodology and drawing the wrong inferences from the fact of using, within a model, as an input, not as something you're managing to this maximum sustained yield. So I think at the bottom it's sort of a misunderstanding, maybe not a direct confrontation. That leads to my concern about the Georgia Strait analysis in particular, which seemed to have the numbers and then to substantially disregard them based on reasoning that I did not find particularly pertinent, i.e., perhaps arbitrary and capricious. So I'd like to know what you say about that. I'm going to give a quick answer and maybe Mr. Slom can elaborate on that as well so that I can give him some time to do that. There's a couple of things you've got to keep in mind. Jeopardy is on the species as a whole. That means all 22 populations, not simply a few. I understand that the plan has adopted this notion that you have to have, what, two viable populations within each region and this wouldn't meet that. That would be ideal for a recovered state. It does not follow that if you don't have those at the present time, you have a substantial reduction in likelihood of achieving recovery. You set up a scheme and you say this is our standard, which is two populations, and you set up this number scheme of figuring out what works for your new viability notion or replacement notion or whatever, and then you don't follow it. That becomes disturbing. What they did was because of not meeting the exploitation rate numbers, they looked more in depth at it. And at the bottom line, and we've listed those and I won't repeat those that are in the brief, but the bottom line is the question is would you be any better off if you had no harvest for those particular populations? And the answer is no. But you're relying on things like the non-natural fish, the hatchery fish, and on other populations. I mean, you're relying on kind of make weights as backups, and it didn't seem to me that the whole tone of this was consistent with the overall plan. And frankly, it seemed to me that there was some imperative to allow fishing in this area and you were going to find some way to do it. Right. I guess the question is always you've got to compare it to prohibiting all fishing. And the reality is most of those fish are taken out in the ocean. So putting a stop to fisheries on the freshwater areas, you're not going to get much. Counselor, you're down to less than three minutes. Right. So I don't want to run from you, but I'm going to. Thank you. Okay. Good morning, Your Honor. My name is Mark Slonim. I represent the Makah Tribe and I'm here on behalf of the Amici Indian Tribes, Washington Department of Fisheries. Let me start with the Georgia Strait and Midhood Canal issue. In the Georgia Strait populations, NIMS did develop its exploitation rate for recovery and found that the overall effect of all fisheries on that population in Alaska, Canada, and in Puget Sound would exceed its desired exploitation rate. I've got double. Yeah, from 14% to 26%. I don't have the exact numbers, but something in that range. Then it did an analysis and said, to what extent does that reduce the chance of meeting our thresholds? And if you look at all the fisheries, it was about a 6% reduction. If you just look at the effect of the Puget Sound fisheries, it was about a 2% reduction. So the impacts of exceeding their exploitation rate were small. Then they looked at the actual escapements under the plan and they noticed that the escapements had been increasing for those populations since these reduced harvest rates had gone into effect. They said as long as the escapements are stable or increasing, that's a sign that the fisheries are not risking either the survival or recovery of the population. Then they also looked at what is the impact of the Puget Sound fisheries on these populations. If we went to no fishing at all in Puget Sound, what's the benefit of that? They said it's very, very small. In our brief, we cited the figures for 2003 and 2004 on the Georgia Strait populations. The Puget Sound harvest rate was 1 in 3%. It's a very, very small number. And so NIMS looked at all that. They did look at, there's a hatchery enhancement program which produces genetically identical stocks to the North Nooksack population and some other factors. But I think the main factors were the impacts, the escapement rates were increasing, the escapement numbers were increasing, and the impacts on the population from the Puget Sound fisheries were very small. In Midhood Canal, if they had eliminated all fishing in Puget Sound, they would have gotten two or three additional fish back to the key population segments. And based on all of that, they concluded that they didn't see a risk to jeopardy from the plan in those areas. And that wasn't just kind of normative or non-quantified factors. The escapement numbers are quantified information. The contributions from Puget Sound to the impacts on those populations are quantified numbers. And they made a judgment call based on all of that. My ignorance, but explain to me what the Puget Sound relevance is. What does the Puget Sound have to do with this? This plan has to do with Puget Sound fisheries. I understand. But what you're saying is that this area is only going to affect the overall numbers. Is that what you're talking about when you're talking about Puget Sound? What are you talking about when you're bringing the word Puget Sound into this? I'm talking about the fisheries that are managed by this plan. In general? Right. If NIMS said the plan's no good, no fisheries in Puget Sound, on the Hood Canal populations they get a total of 20 additional fish and two or three in the key population segments of concern. On the Nooksack River they said we get, you know, I don't remember the exact numbers, but similarly the benefits of eliminating all the Puget Sound fisheries under this plan are de minimis. Thank you, counsel. Your time has expired. Thank you. Mr. Brant Erickson, you have some reserve time. Thank you, Your Honor. I guess the point I would make is that this case is not about the architecture. It's not about the complex models. It's not about all the data. It's about the assumptions and underpinnings for the approach. It's not about in the RAP modeling work that they did on nine populations, one input in that process. It's the end point that they're using. I thought it was very instructive. One of the most instructive arguments in the federal agency's brief was an assertion that if a higher viable population threshold was used in their work as we had proposed, that the result would be higher authorized harvest rates. That didn't make any sense to me either, but I don't know why. The higher the threshold, the higher the harvest rate. It doesn't seem to me to be in the papers. It's in the brief, and I didn't understand it at least. I believe the idea is that the theory is that because they have told themselves that the viable threshold is a measure of how much harvest the population can sustain as opposed to how many fish are needed for recovery of that population, it's confused their approach to this whole thing. And that's, in essence, our point. By confusing the concepts, and you have an admission from counsel for the United States that the concept of viability used here was different than used in the VSP paper and used elsewhere. It would be helpful for me to know, and I could not understand from your brief, and I can't understand from what you're saying now, which is on whatever approach you are suggesting, would the numbers turn out different? Because you're saying the problem is the architecture, but I think the problem in the end are the numbers that came out with the right numbers or the wrong numbers. Yes, and I think if you look at Criterion B in Limit 4 of the 4D rule, that's where the agency describes the different approach it is supposed to take if a population is below or above its viable threshold. Now, it says if it's above the viable threshold, you can manage it to basically stay where it is. If it's below a viable threshold, you have to manage it so it doesn't slow progress toward viability. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision, and we will hear argument next in Guzman v. Astru.
judges: Hall, O'scannlain, Berzon